So who is beginning here? Your Honor, I'll be beginning. My name is... I should say that, I mean, I understand that you had a problem, but this is no way to have an argument. Divide into small pieces like this. It really never works, and you're just, you know, disadvantaging yourself and us. But that's what you're doing, so go ahead. I apologize, Your Honor. Hopefully we will make this as simple as we can. We're certainly going to try and get to the key points that we feel are appropriate for the Court's consideration. All right, let me tell you, I have a list here too, okay, as to what issues would be helpful to us. There are the issues as to SUNT 4, the question of BARD eligibility. There's the line plant issue, which I guess is as to subject to BARD, is that what that's about? Yes, it is. And then there are the two copper plants as to, I'm now even blanking, but there was a complicated legal issue there as well, a legal question. Yes, Your Honor. I'm sorry, what? I said yes, Your Honor, there is. Okay. Those are the three. Terrific. With regard to those issues, specifically SUNT 4 is one that hopefully this Court will not have to review significantly. We do believe that the most natural reading of the regulations I'm sorry, could you identify yourself and tell me who you represent, so I know what questions I can ask. Absolutely. My name is Carroll McGuffey, and I represent the State of Arizona. So we will be splitting the argument three ways, nine minutes a piece. I apologize for the split, but we do have Jeremy Marwell to represent Arizona Mining Association. And then last we'll go Mark Delaquil representing the Smit plant. With regard to SUNT 4, the argument that we made in our brief is relatively simple on its face. The most natural reading of the regulations is that when a plant is reconstructed, then it becomes a new plant, and it should be treated as a new plant. And because it is a new plant, that sets the standard for which plants must evaluate part. There are a number of problems with this. One of them is that the statute doesn't say any such thing, or the regulation. And this is the guidelines, and the guidelines aren't directly applicable. And also there's a preamble sentence which seems to set what the, you know, context of that sentence is, which is not this context. So if you could address those concerns I have with your representation. Also, this is an area, I guess, where there's Chevron deference to the Board, or our deference to the Board, I would guess. Yes, Your Honor, although the EPA, I mean, that's right. And before I go any further, I do want to provide you some additional context. It's not part of the record, but I think the Court would be interested. The facility is in discussions with EPA, and it is expected that an agreeable resolution to these issues will be found in Chevron's report. It's a short order, so we had not intended to spend a significant amount of time on this argument for the Court's discussion. Again, it may be one of those where the rug is pulled out, and we apologize for this. But nevertheless, as stated in our brief, the most natural reading of the regulation specifically states that a reconstruction plant should be treated as a new plant. That's the interpretation that Arizona understood, and it is an attempt to reconcile two competing congressional objectives. And so with two competing congressional objectives, one to encourage coal usage, the Fuel Use Act, compared against the Best Available Retrofit Technology Program, it was reasonable to understand that the way to discern the answer to that question is to simply follow the letter of the regulations. Again, in the guidelines. You're correct. It's not in the regulations. Am I right? No, Your Honor. It's not in the specific code section, but it's in the appendix to the code section, which is regulation. It was adopted pursuant to notice and comment. But not as applicable to this plant? Your Honor, I believe it's at least persuasive, and I believe — That's right. Okay. With regard to the lime plant, that one also can, I think, be understood relatively easily. Before, again, I start with that, we do have potentially pending settlement negotiations that expect to resolve that issue. But just to answer your Court's question and concern with that issue, the State modeled that facility and came up with .498. And it decided that was too close to call. The threshold for contribution is .5. So .498 is .002 next to that standard. So the State itself recognized that something more needed to be done. So we conducted additional modeling. Air quality modeling, a lot of times, is conducted in this manner. It's iterative. You start with a very conservative approach, and then it's sort of a screening test. And if it doesn't pass the test on that, or if it appears that there may be some more review required, that additional review is conducted. That's exactly what the State did. Conducted a second and, in fact, a third round of modeling using different, more Those additional reviews showed the value to continue to drop. That confirmed for Arizona that, in fact, the first modeling run, as you would expect it to be, would be overly conservative. You got a couple of different estimates. You got down to .46 and then ultimately down to .424. That's correct. One of the things that was surprising that I don't understand, and maybe I've missed something, is that in the Federal Register, I'm looking at 46.153 and 46.154, where EPA discusses this, that EPA begins by starting about the .498. Then it talks about the .424. That's the bottom point of 46.153. And then on 46.154, it ends up by talking again about the .498 and seems to ignore entirely the .424 and the .46 estimate, which is also well below the guidelines. It doesn't show up at all. Your Honor, we're surprised by that as well. Am I missing something, or is there some other explanation for No, Your Honor. You have identified it correctly. We are at a loss as well as to explain why these other modeling runs, which, again, as I mentioned, are more accurate, more up-to-date, using more up-to-date modeling technology that EPA itself has approved. It appears EPA was concerned that there was not sufficient explanation of those additional modeling runs. But when you read down into what EPA was doing there, actually what happened is that you've got a misunderstanding. But EPA's larger problem, as I understand it, was with the 3-year averaging as a screening device. Yes, Your Honor. And what EPA was concerned with on the 3-year averaging was that that's how the Federal land managers do it when they conduct, again, a very high screening-level analysis. But there's certainly nothing in the regulations, nothing in the statute that requires a particular averaging period. That's exactly the kind of thing that should be left in the I mean, this is sort of a classic problem with averaging statistics because if you look, if you break down what you actually had there, you had in 2003, the last year, the Grand Canyons, and I was misspeaking before because I was thinking of this case, that was .585, right? Even on the improved, the second version, right? So basically what you have is a modeling in the last applicable year, which you think would be the most relevant one, of considerably higher than the cutoff for the Grand Canyon. Yes, Your Honor. But you have to also recognize that some of the years can be anomalous. What you have, particularly in Arizona, are significant sources of natural But all this is doing, all the, see, that's why it's significant that this is just a screening cutoff, right? That's correct, Your Honor. It's not going to say what the actual BART is or whether there is any. It's just going to say now you have to do the BART analysis. Yes, Your Honor. And that seems quite different from the kinds of things for which the 3-year averaging is usually used. Certainly, Your Honor. And Arizona believed that it was taking the appropriate course here and using the threshold that it had adopted. Could you explain why? Well, again, Arizona believed it to be an appropriate use of the model to understand that Is there anything else that uses a 3-year average? Yes, Your Honor. In fact, many of the National Ambient Air Quality Standards, which protect public health, not just visibility. But those are for actual standards. That's correct. Those aren't for the screening, at the screening level. Yes, Your Honor, you are correct. It's not the screening level, but it's how to determine compliance to whether people's public health is protected. And that's not what's at issue with this case. If I'll just, with the few seconds left that I have before I turn it over to other counsel, I want to refocus the Court on this program. Judge Berzon, as you indicated, this is a regional HACE program supposed to add up small increments to a significant change in visibility. And that is not what we have here. What we have here are modeling results that suggest large incremental changes. But when EPA conducted its analysis of a more realistic review of how much visibility would improve, it was a tenth of what a human can detect. That's the opposite of the program. And something has certainly gone wrong here. And it has to do with the way these models are overused and over-conservative. And I'm at my nine minutes. I'll turn it over to other counsel. Thank you. Thank you, Your Honor. May it please the Court, Jeremy Marwell for the Arizona Mining Association, focused on the copper smelter issues. Judge Berzon, there are two main legal issues with respect to the copper smelters and I wasn't sure which one. One was with respect to the sulfur, whether the State reasonably concluded that the existing new source standards constituted BART for the copper smelter. Whether, I'm sorry? Whether the existing new source standards that the State looked at, whether they constituted BART, whether that determination was reasonable. And then the second set of issues had to do with the nitrogen, whether the State reasonably concluded that the smelters were not subject to a BART determination because of the very small nature of the ethanol. I think I'm talking about the second, but you can talk about both if you want. Okay. To start with the nitrogen, and to start with the, in the first phase, Judge Berzon, you noted that the State or the EPA has more capacious authority when it's imposing a Federal plan. Here, to be clear, we're talking about EPA's review of the State plan and the disapproval of that. And with respect to the, with respect to the State's determination, EPA had two basic problems. First, they say that, that this, that, excuse me. First, they said that, that, so first, EPA did not explain why, why Arizona was required to consider not only the nitrogen, which everyone agrees here was de minimis, has a tiny effect on visibility and is in absolute terms de minimis, why they were required to conduct a BART analysis anyway for the nitrogen simply because of the sulfur emissions from the sulfur dioxide emissions from the smelters. And whatever you think about the standard review, a failure, an agency, EPA's failure to explain why it has taken a certain position is arbitrary and capricious. And we don't know, if you look at the record, if you look at EPA's brief, we don't know why EPA is requiring this aggregation approach. There may be a reason, but it's not evident to me what that reason is. And in fact, neither the statute nor the regulation, which are the only things that are binding here on the, on Arizona, require that. In fact, the statute suggests to the contrary that the BART determination focuses on such impairment so you have to regulate pollutants which are emitted which may reasonably be anticipated to impair visibility and the state is required to regulate to address such impairment. What did EPA say about whether you had to consider a pollutant such as the NOx in connection with something that was not de minima such as the SO2? So my understanding Was EPA consistent in its explanations? If not, what did it say? No. So I don't believe so. In the 2005 regional Hays rule, EPA said it's reasonable to read the statute as requiring a BART determination. It's very odd because they were kind of muttering in there, but they did not actually change the regulation. Right? That's right. And I think, but I think that's telling. I mean, they say that they, I think that's telling. That discussion seemed to be a discussion that's somewhere further down the analytic line, i.e. at the BART stage, you could do a very quick BART analysis, which is what they ended up doing. Right? So it kind of gets a little silly, but they never actually said, certainly they never said for BART eligibility purposes that you could do more than take out 40 tons per year of plants. Right? That's right. But again, I think because what we're dealing with here is Arizona's determination in the first instance. The question is, has EPA identified a way in which the State's plan  to some requirement? You have certain requirements by the statute. Well, they say it's contrary to the regulation because the regulation said that a plant is BART eligible with regard to a second pollutant as, or any pollutant, except if it has less than 40 tons per year emissions. So, with respect, I'm not sure that's what the regulation actually says. I read the regulation as basically just taking the same language as in the statute. And when you look at EPA's brief, they say statute, regulation, and we have reasonably interpreted the regulation in the guidelines. So, I think their position boils down to the idea that Arizona violated the guidelines here, which we know, with respect to the copper smelters, are not binding and they say on their face that States have discretion to deviate or to adopt other approaches from the guidelines. I thought they were talking directly about the regulations. Yeah, but I think when you read the regulation it doesn't say that, right? The regulation, so this would be at app 11 of the blue brief, our blue brief. And it says, determination of BART for each BART eligible source in the state that emits any air pollutant which may reasonably be anticipated to cause or contribute to any impairment of visibility. I really can't hear you. Could you get a little louder please? So, at app 11, it says you are required to do a determination of BART for each BART eligible source that emits any air pollutant which may reasonably be anticipated to cause or contribute to any impairment of visibility. The regulation doesn't say that the source becomes subject to BART for every pollutant. And when EPA So I said any. That's right. Any air pollutant which may reasonably be anticipated to cause or contribute to an impairment of visibility. But EPA But there's no suggestion here that nitrogen by itself causes or contributes to an impairment of visibility. The undisputed figures in the record are that for the Miami smelter you're at 0.1 and for the Sarko-Hayden smelter you're at ten times less than that. And EPA has approved a 0.5 decibel threshold. Everyone agrees that the nitrogen doesn't. EPA's entire position is that you have to do a full BART analysis for nitrogen simply because you had sulfur you have sulfur emissions that are above the threshold. So I whatever you think about deferring to the agency I don't think you should do that here because you don't have an explanation for why they have interpreted this regulation and we don't think they have actually interpreted the regulation to require it. We have a second independent reason on the nitrogen and that's the question of whether the nitrogen emissions are below 40 tons per year the de minimis threshold and I think if you agree with us on either then that's sufficient to vacate and remand. And what did EPA say about the de minimis question? So the de minimis I understand their position to be that the de minimis the calculation of what a source has potential to emit cannot in this instance look to historical data about actual emissions and there are several problems with that. The first one is that that's the opposite of what you would  You can look at the theoretical capacity all the time and you can look at how long harvest season is or you can look for historical data about how often the power goes out because you have  large quantity of gas and pretending that that would be the full level that would run every day for the relevant period and they said there were physical and various limitations on the smelter and the smelter made physical modifications that limit the amount of natural gas. So I think EPA's contrary view rests on continuous emissions which we know was a conservative and reasonable estimate of what the emissions are. If you want to look behind the curtain they agreed the emissions are below 40 tons per year and below the estimate of potential to emit a significant amount of     the emissions were below 40 tons per year and below the estimate of potential to emit a significant amount of gas. So they agreed the emissions are below 40 tons per year and below the   potential to emit a significant amount of the emissions were below 40 tons per year and below the estimate of potential to  a significant amount of gas. But there's a separate component of the visibility program called the reasonable progress component. Phoenix cement is a reasonable progress source. Why is that? It's too small to be a BART source. And it's too new to be a BART source. So as a reasonable progress source, Phoenix cement is not presumptively something that would be evaluated as part of the visibility program. For most of the review   we did, the EPA made two fundamental mistakes in disapproving that determination. Can I interrupt you for a minute? Yes. Are you also in negotiations with the EPA at this point? We are in negotiations on the federal plan, but not on the SIP disapproval. There's a separate phase 3 action. We filed a petition for review challenging only part of the federal plan. It had to do with a demonstration project that we believed was not the subject of proper notice. EPA has sent a letter stating that it would grant reconsideration. There's been no notice published in the federal register. I do not expect that the rug will be pulled out from under you. I do  expect that  rug will be pulled out from   I do not expect that the rug will be pulled out from under you. I do not expect that the rug will  pulled out from under will be pulled out  under  I  not expect that the  will be pulled out      out  under you. I do rug will be pulled  from under you. I out from under you.  do you.  do not expect that  amendment in the case and is submitted and we  recess. Thank you very much. ** No audio Vijay Narmal no audio
judges: Berzon, Bybee, Owens